J-A13035-17

2017 PA Super 358

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| ANTHONY FORD | |
| Appellant | No. 196 EDA 2016 |

Appeal from the Judgment of Sentence December 16, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0012403-2014

BEFORE: LAZARUS, OTT, and FITZGERALD,[*] JJ.

OPINION BY FITZGERALD, J.: **FILED NOVEMBER 14, 2017**

Appellant, Anthony Ford, appeals from the judgment of sentence imposed in the Philadelphia County Court of Common Pleas. Appellant claims the trial court erred in denying his motion to suppress the firearm seized from his home. He also argues that the trial court erred in finding the evidence sufficient to sustain his conviction for possession of a firearm with an altered manufacturer's number, because the manufacturer's number was merely obscured by corrosion, not by human hands.[1] We affirm the trial court's order denying suppression, but we reverse Appellant's conviction for possession of a firearm with an altered manufacturer's number.

The trial court summarized the factual and procedural history as follows:

> On October 20, 2015, [] Appellant, [] through counsel[,] argued a motion to suppress, which was denied. On that

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 6110.2(a).

same date, he was found guilty following a [non-jury] trial of [p]ossession of [f]irearm [p]rohibited[2] and [possession of firearm with altered manufacturer's number.] Sentencing was deferred until December 16, 2015 for the preparation of a presentence investigation and mental health report. On that date[, Appellant] was sentenced to [concurrent terms] of . . . two and one-half [] to five [] years[' imprisonment] followed by three [] years of probation.

On January 6, 2016[,] Appellant filed a timely notice of appeal. Trial counsel filed a motion to withdraw[,] which was granted. New counsel was appointed. On February 18, 2016, [the trial court] entered an [o]rder pursuant to Pa.R.A.P. 1925(b). On March 8, 2016[,] Appellant filed a timely response to [the trial court's] order.

On August 28, 2014[,] at around 10 pm, Philadelphia [p]olice [o]fficers Patrick Biles along with his partner, Officer St. Onge, were in uniform riding in a marked police car. They received several radio calls directing them to 2010 Wilmot [Street] for reports of a person bleeding in the backyard and a person with a gun.[3] The officers went to the backyard of 2010 Wilmot [Street4] but did not find anyone. They then went through an alleyway to Dit[]man [Street]. There[,] several neighbors were directing them to 4663 Ditman [Street]. While standing on the porch of [4663 Ditman Street,] Officer Biles testified that he heard multiple voices screaming. Based on the information received, and the numerous gun arrests that Officer Biles conducted in that area, which he classified as a high crime area, he knocked on the door. When no one answered, Officer Biles opened the unlocked door and went inside. The home appeared to be under construction[,] but there were several lights on. Once inside, Officer Biles observed three individuals standing in what would be the living room of the

---

[2] 18 Pa.C.S. § 6105(a)(1).

[3] Officer Biles testified the first radio call "came out as a person screaming." N.T., 10/20/15, at 12.

[4] Officer Biles testified the backyard of 2010 Wilmot Street "backs up to the back door of 4663 Ditman [Street]," **Id.**, the address where the police subsequently found Appellant.

home. Specifically, he observed [] Appellant make a swinging motion with his arm and place an object on the kitchen chair next to him. Officer Biles made this observation from approximately thirty feet away. He ordered [] Appellant to show his hands and placed him in handcuffs. Officer Biles recovered a .38 caliber silver handgun with the serial number obscured on the chair where he observed [] Appellant make the swinging arm motion.

Trial Ct. Op., 9/13/16, at 1-2 (citations and footnote omitted). During trial, the parties stipulated that the serial number on the handgun was "obscured by corrosion [and] recovered by polishing." N.T., 10/20/15, at 88.

Appellant raises the following issues for our review:

A. Was it error for the [trial] court to deny Appellant's motion to suppress evidence of a gun found in Appellant's home, where the gun was the product of a warrantless search of said home by police, without probable cause and exigent circumstances?

B. Was it error for the trial court to find that Appellant was guilty of possession of a firearm which has had the manufacturer's number integral to the frame or receiver altered, changed, removed, or obliterated, where the number was merely obscured by corrosion, and was recovered by polishing?

Appellant's Brief at 2 (capitalization omitted).

Appellant first contends that the trial court erred in denying his motion to suppress, because the gun found in his home was "the product of an unreasonable search and seizure." *Id.* at 5. He asserts the police officers lacked probable cause and exigent circumstances to justify a warrantless entry and search of his home. We disagree.

We review the denial of a motion to suppress as follows:

- 3 -

An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa. Super. 2015) (citation, alterations, and ellipsis omitted).

In a private home, searches and seizures without a warrant are presumptively unreasonable. Absent probable cause and exigent circumstances, the entry of a home without a warrant is prohibited under the Fourth Amendment. In determining whether exigent circumstances exist, a number of factors are to be considered. . . .

Among the factors to be considered are: (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified.

> Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or a danger to police or other persons inside or outside the dwelling.

*Commonwealth v. Roland*, 637 A.2d 269, 270-71 (Pa. 1994) (citations, quotations, and ellipsis omitted). Further, "when we examine a particular situation to determine if probable cause exists, we consider all the factors and their total effect, and do not concentrate on each individual element. We also focus on the circumstances as seen through the eyes of the trained officer . . . ." *Commonwealth v. Chase*, 575 A.2d 574, 576 (Pa. Super. 1990) (citations, alteration, and ellipsis omitted).

Exigent circumstances exist where "the police reasonably believe that someone within a residence is in need of immediate aid." *Commonwealth v. Galvin,* 985 A.2d 783, 795 (Pa. 2009) (citations omitted). Additionally, "[i]t is widely recognized that situations involving the potential for imminent physical harm in the domestic context implicate exigencies that may justify limited police intrusion into a dwelling in order to remove an item of potential danger." *Commonwealth v. Wright*, 742 A.2d 661, 664 (Pa. 1999) (citations omitted). The relevant inquiry is "whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger[.]" *Michigan v. Fisher,* 558 U.S. 45, 49 (2009) (citation and internal quotation marks omitted). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make

split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (citation omitted). Additionally, "it is a matter of common sense that a combination of events each of which is mundane when viewed in isolation may paint an alarming picture." *Id.* at 476-77.

In this case, exigent circumstances justified the officers' warrantless entry into Appellant's house. The evidence adduced during the suppression hearing demonstrates that on the evening in question, police officers received reports of someone screaming, someone bleeding, and someone with a gun at the Wilmot Street residence abutting Appellant's house. N.T., 10/20/15, at 12. Officer Biles, an eleven-year officer in this police district, described this as a "high crime area." *Id.* at 15. The officers did not find anything at the Wilmot Street address, but when they proceeded to Ditman Street, one neighbor pointed towards 4663 Ditman Street. *Id.* at 14-15. Another neighbor who lived next door to 4663 Ditman Street was standing in her doorway and appeared frightened, distraught and happy to see the officers. *Id.* at 15. Officer Biles asked the neighbor if she heard any gunshots, and she replied: "Not yet." *Id.* at 13. As the officers approached 4663 Ditman Street, they heard multiple voices screaming inside. *Id.* Officer Biles knocked on the front door, but nobody answered, possibly because the screams drowned out the knocks. *Id.* Based on these facts, the officers reasonably believed that there was an immediate threat of violence and that those inside

Appellant's home were in danger. The trial court properly admitted all evidence arising from the officers' warrantless entry into the house. *See Commonwealth v. Potts*, 73 A.3d 1275, 1281 (Pa. Super. 2013) (totality of circumstances justified officers' reasonable belief that they needed to enter defendant's apartment to ensure that another occupant was not in danger or in need of immediate aid; officers were responding to emergency call for alleged domestic dispute involving someone screaming at defendant's apartment building, screams were still emanating from defendant's apartment when officers arrived, occupant answered officers' knock after delay, very distraught, apparently crying, sweating, breathing heavily, and with disheveled clothing, and officers saw defendant through open doorway, running into bedroom and shutting door); *Commonwealth v. Hinkson*, 461 A.2d 616, 618-19 (Pa. Super. 1983) (exigent circumstances justified warrantless search of defendant's house, even though defendant was outside house, where police reasonably concluded that someone in house could have been held hostage or had been hurt during shooting incident and where man had already been shot outside the house; to have delayed action while search warrant was obtained would have unduly risked lives of public and police).

Next, Appellant argues that the evidence was insufficient to sustain his conviction under 18 Pa.C.S. § 6110.2(a), because this statute does not criminalize possession of firearms whose serial numbers are obscured by natural corrosion. We agree.

We begin by noting our standard of review:

> [O]ur standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.

**Commonwealth v. Rahman**, 75 A.3d 497, 500 (Pa. Super. 2013) (citations and quotations omitted).  When, as here, the appellant raises a question of statutory construction, "our standard of review is *de novo*, and our scope of review is plenary."  **Commonwealth v. Giulian**, 141 A.3d 1262, 1266 (Pa. 2016).

> In matters involving statutory interpretation, the Statutory Construction Act directs courts to ascertain and effectuate the intent of the General Assembly.  1 Pa.C.S. § 1921(a).  A statute's plain language generally provides the best indication of legislative intent.  **See**, **e.g., McGrory v. Dep't of Transp.,** [] 915 A.2d 1155, 1158 ([Pa.] 2007); **Commonwealth v. Gilmour Mfg. Co.,** [] 822 A.2d 676, 679 ([Pa.] 2003).  In construing the language, however, and giving it effect, "we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear."  **Roethlein v. Portnoff Law Assocs., Ltd.,** [] 81 A.3d 816, 822 ([Pa.] 2013), citing **Mishoe v. Erie Ins. Co.,** 824 A.2d 1153, 1155 ([Pa.] 2003).  **Accord Commonwealth v. Office of Open Records,** [] 103 A.3d 1276, 1285 ([Pa.] 2014) (statutory language must be read in context; in ascertaining legislative intent, every portion is to be read together with remaining language and construed with reference to statute as a whole).

**Id.** at 1267.

We must construe words and phrases in statutes "according to rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S. § 1903(a). "One way to ascertain the plain meaning and ordinary usage of terms is by reference to a dictionary definition." *In re Beyer*, 115 A.3d 835, 839 (Pa. 2015) (citation omitted). We must also take into account what the statute does not prescribe. "[I]t is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include. Consequently, [a]s a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says; one must also listen attentively to what it does not say." *Commonwealth v. Johnson*, 26 A.3d 1078, 1090 (Pa. 2011) (internal quotations and citations omitted).

Section 6110.2 provides in pertinent part: "No person shall possess a firearm which has had the manufacturer's number integral to the frame or receiver altered, changed, removed or obliterated." 18 Pa.C.S. § 6110.2(a). Section 6110.2 is part of Pennsylvania's Uniform Firearms Act, 18 Pa.C.S. §§ 6101-6127, whose purpose "is to regulate the possession and distribution of firearms, which are highly dangerous and are frequently used in the commission of crimes," *Commonwealth v. Corradino*, 588 A.2d 936, 940 (Pa. Super. 1991), and to "prohibit certain persons from possessing a firearm within this Commonwealth." *Commonwealth v. Baxter*, 956 A.2d 465, 471 (Pa. Super. 2008). Firearm serial numbers are an important tool because they help police officers identify the owner of weapons used in criminal offenses.

To ensure that serial numbers remain intact on firearms, the legislature has prohibited persons from defacing these markings, *see* 18 Pa.C.S. § 6117(a), and from purchasing or obtaining defaced firearms, *see* 18 Pa.C.S. § 6110.2.

The question here is whether corrosion of manufacturer's numbers renders them "altered, changed, removed or obliterated" within the meaning of section 6110.2. The Crimes Code does not define this phrase or any individual terms therein. Thus, we consult the dictionary, which defines **(1)** "alter" as "to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing it into something else," Webster's Third Int'l Dict. (1986) at 63; **(2)** "change" as "to make different . . . in some particular but short of conversion into something else . . . [or] to make over to a radically different form, composition, state, or disposition," *Id.* at 373; **(3)** "remove" means "to get rid of as by moving" as in eradicate or eliminate, and is synonymous with erase, *Id.* at 1921; and **(4)** "obliterate" as "1 : to remove from significance and bring to nothingness : as a: to make undecipherable or imperceptible by obscuring, covering, or wearing or chipping away . . . b: to remove utterly from recognition . . . or c (1): to remove from existence : make nonexistent : destroy utterly all traces, indications, significance of . . . (2) to cause to disappear[.]" *Id.* at 1557.

We do not think that corrosion falls within the plain meaning or ordinary usage of these terms. The dictionary defines "corrode" as typically meaning

"a gradual wearing away or alteration by a chemical or electrochemical essentially oxidizing process (as in the atmospheric rusting of iron)[.]" Id. at 512.

Although, in an academic sense, "corroded" items might be "changed" or "altered" through imperceptible forces of chemistry, common sense does not support reading section 6110.2 in this manner. As stated above, we must listen attentively to what a statute "does not say." *Johnson*, 26 A.3d at 1090. In our view, section 6110.2 does not say that a crime takes place when a person possesses a gun whose markings have become illegible due to natural causes.

Further support for this view emerges when we read section 6110.2(a) *in pari materia*[5] with 18 Pa.C.S. § 6117(a), another statute in the Uniform Firearms Act. Section 6117, entitled "Altering Or Obliterating Marks Of Identification," provides: "**No person** shall **change, alter, remove, or obliterate** the manufacturer's number integral to the frame or receiver of any firearm . . ." (Emphasis added). The bolded language, which is virtually identical to section 6110.2(a), only prohibits a person from intentionally defacing manufacturer's numbers; it does not apply when the manufacturer's numbers corrode due to natural causes. Since a person cannot

---

[5] "Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things." 1 Pa.C.S. § 1932(a). "Statutes *in pari materia* shall be construed together, if possible, as one statute." 1 Pa.C.S. § 1932(b).

be liable under section 6117 for **defacing** a firearm when the manufacturer's numbers corrode, it would be nonsensical to hold him liable under section 6110.2 for **possessing** such a firearm.

For these reasons, we conclude that the evidence is insufficient to sustain Appellant's conviction under section 6110.2(a). We do not find it necessary to remand for resentencing. Appellant remains convicted under 18 Pa.C.S. § 6105, and his sentence under section 6105 is the same length as, and runs concurrently with, his former sentence under section 6110.2. As a result, his sentencing scheme remains the same despite our reversal of his conviction under section 6110.2. ***Compare Commonwealth v. Williams***, 871 A.2d 254, 266 (Pa. Super. 2005) (where appellate decision affects entire sentencing scheme, all sentences for all counts will be vacated in order for trial court to restructure its entire sentencing scheme).

Judgment of sentence affirmed in part and reversed in part.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/2017

- 12 -